**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

CORRY D. SEARLES,

                 Plaintiff,

v.                                                   ACTION NO. 2:14cv474

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

                 Defendant.

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

       Plaintiff, Corry D. Searles ("Searles" or "plaintiff"), brought this action pursuant to 42

U.S.C. § 405(g), seeking judicial review of a decision of the Acting Commissioner

("Commissioner") of the Social Security Administration ("SSA") denying his applications for a

period of disability and disability insurance benefits ("DIB") under Title II of the Social Security

Act, as well as his claim for supplemental security income ("SSI") under Title XVI of the Social

Security Act.

       An order of reference dated January 5, 2015 assigned this matter to a United States

Magistrate Judge.  ECF No. 10.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C),

Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby

recommended that Searles' motion for summary judgment (ECF No. 16) be GRANTED,

defendant's motion for summary judgment (ECF No. 17) be DENIED, and the decision of the Commissioner be VACATED and REMANDED.

## I. PROCEDURAL BACKGROUND

Searles protectively applied for DIB and SSI on December 6, 2012, alleging disability since June 1, 2011 due to hip, collarbone, and lower back injury. R. 172-77, 197.[1]  Searles' applications were denied initially and on reconsideration.  R. 43-119.  At Searles' request, a hearing was held before an Administrative Law Judge ("ALJ") on April 9, 2014.  R. 23-42.  At the hearing, which occurred by video teleconference, the ALJ received testimony from Searles (who was represented by counsel) and an impartial vocational expert ("VE").  R. 25-42.  On April 29, 2014, the ALJ found that Searles was not disabled within the meaning of the Social Security Act from June 1, 2011, the alleged onset date, through the date of the decision.  R. 10-22.[2]

The Appeals Council denied Searles' request for administrative review of the ALJ's decision on September 8, 2014.  R. 1-5.  Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. § 405(g); 20 C.F.R. § 404.981 (2012).  Having exhausted all administrative remedies, Searles, proceeding *pro se*, filed a complaint with this Court on October 27, 2014.  ECF No. 8.  The Commissioner answered on December 23, 2014.  ECF No. 12.  In response to the Court's order, Searles filed a motion for summary judgment on January 15, 2015.  ECF No. 16.  Defendant filed a cross-motion for summary judgment with a memorandum in support on March 6, 2015, and Searles replied on

---

[1] The citations in this Report and Recommendation are to the Administrative Record.
[2] The ALJ further found no basis for reopening Searles' prior Title II or Title XVI applications. R. 10.

2

March 12, 2015.  ECF Nos. 17-18, 21.  As neither counsel in this case has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision based on the memoranda.

## II. <u>FACTUAL BACKGROUND</u>

### A.   *Searles' Background*

Born in 1981, Searles was thirty years old on his alleged onset date of June 1, 2011, and thirty-three at the time of his administrative hearing.  R. 30.  From 1997 through January 2012, Searles worked at a furniture store, as a general laborer at a chicken plant, and as part of a highway crew.  R. 198.  After his disability onset date, Searles attempted part-time work at a grocery store.  R. 36-37.

### B.   *Searles' Medical Record Prior to His Alleged Onset Date*

Following an automobile accident in 2001 that resulted in a left hip fracture, Searles' hip was surgically repaired with an open reduction internal fixation.  R. 286.  Searles was able to return to work following recovery.

On August 5, 2005, Searles was injured at work while moving barrels off of the road when a work truck struck him from behind.  R. 286, 290.  An x-ray of his pelvis and left hip was unremarkable, showing no dislocation or fracture, and stable post-operative changes.  R. 276. Searles was diagnosed with a contusion of the hip, given Vicodin and crutches, and instructed to follow up with "ortho."  R. 272.

Richard Holden, M.D., with Sports Medicine and Orthopaedic Center, Inc., examined Searles on August 24, 2005, and diagnosed Searles with a gluteus muscle contusion.  R. 290-93.

3

Dr. Holden prescribed four weeks of physical therapy to improve Searles' gait, and released Searles to restricted duty of sitting, with limited walking and standing. R. 292-93.

Doctors with Eastern Shore Rural Health treated Searles on three occasions, from November 2005 through January 2006, for low back pain without radiation and likely paralumbar muscle spasm. R. 286-301. They prescribed ibuprofen, Flexeril, and physical therapy. *Id.*

Following an examination on April 10, 2006, Dr. Holden noted Searles could move around the room without difficulty with no guarding or listing, was able to bend over and touch his ankles, and stand up without dysrhythmia, lateral bending was within normal limits, and extension of the back was "quite excellent" at "80 to 90% of normal but no dysfunction noted." R. 304-306. Searles was able to stand and rotate with hands on his pelvis with no discomfort; he had symmetrical range of motion of the hips; his leg, ankle, and quad strength were normal and symmetrical; his straight leg raising on the right was negative; and, he could raise his left leg to 90 degrees with no compensation or complaints. R. 307. Dr. Holden concluded Searles had basically a normal examination, but because of his previous accident, Dr. Holden ordered an MRI of Searles' spine, and released him to restricted duty. R. 308.

Two x-rays of Searles' lumbar spine taken on April 11, 2006 were unremarkable, revealing normal curvature and alignment. R. 303. An MRI performed on May 6, 2006 was also negative and showed normal discs, no spinal stenosis, no disc herniation, and no nerve root encroachment. R. 310.

On June 29, 2006, Richard Shea, Ph.D., a clinical psychologist with the Virginia Department of Rehabilitative Services, examined Searles and prepared a "Psychology Report"

4

dated July 10, 2006.  R. 319-23.    Dr. Shea noted that, while Searles' insight was clear, his judgment was fair, and he did not appear anxious or angry, Searles appeared to be depressed, his cognitive function was below average, his concentration skills were in the low average range, and his short-term memory was deficient.  R. 320.  Dr. Shea assigned a Global Assessment of Functioning ("GAF") score of 50 to 55, diagnosed depressive disorder not otherwise specified secondary to Searles' health condition and inability to work, and recommended that Searles seek psychiatric services for depression.  R. 323.  Dr. Shea found Searles had the cognitive capacity for simple or repetitive tasks, had the ability to work independently and come into work consistently, and would require no special supervision if working on simple repetitive tasks.  R. 323.  However, Dr. Shea found that Searles' ability to interact with co-workers, supervisors, and the general public may be hampered due to his depression, as would his ability to handle stress. R. 323.

Almost three years later, on April 6, 2009, Nelson M. Santana, PA-C (physician assistant certified), with Eastern Shore Rural Health System examined Searles who reported upper back pain.  R. 342.  Searles was prescribed Flexeril and tramadol, and given a note for being off work that day, to return to work the following day.  R. 342.

On August 10, 2009, Searles requested a medical clearance to work from Maria Carmelita, M.D., with Eastern Shore Rural Health System.  R. 339.  Searles indicated his low back pain was well resolved, and that he had not experienced back pain for four to five months. R. 339.  An examination of Searles' spine was unremarkable, with no spinous tenderness, no paraspinal tenderness, no CVA (costovertebral angle) tenderness, no spasm, and a full range of

motion without pain.  R. 339.   Dr. Carmelita assessed that Searles was pain free and cleared him to work at Perdue.  R. 339.

### C.     Searles' Medical Record After His Alleged Onset Date - June 1, 2011

On November 11, 2011, almost two years later and five months after Searles' alleged onset date, Searles was examined by Daniel Makas, Osteopathic Doctor ("D.O."), with Eastern Shore Rural Health System.  R. 324.   Searles appeared well and in no acute distress, but complained of hip pain.  R. 324.  Searles had a decreased range of motion in his hip, but full range of motion in his knee, ankle, and foot.  R. 324.  His motor, sensation, vascularity, deep tendon reflexes, and strength were grossly intact.  R. 324.  Searles was given a prescription for Prednisone, and a work note excusing him for three days, to return to work the following Monday.  R. 324.

Searles was admitted to the emergency room in Gainesville, Florida, on January 3, 2013, with complaints of back and hip pain.  R. 348-54.  Searles described chronic aching pain that did not radiate and worsened with bending, twisting, and prolonged ambulation.  R. 349.  Searles did not exhibit any swelling, tingling, weakness, numbness, paresthesias, or gait problem, and he was calm, cooperative, well groomed, and his behavior was age appropriate and appropriate to the situation.  R. 350, 353.  Searles left during treatment without medical orders or directions.  R. 352.

In connection with Searles' application for disability benefits, Robert A. Greenberg, M.D., Internist, performed a consultative examination on March 21, 2013.  R. 359-62.  Searles was 5'8" tall, and weighed 244 pounds.  R. 360.  He had a decreased range of motion of the lumbar spine and hips with pain, though had full range of motion of all other extremities.  R.

360-61.  Searles experienced positive straight leg raising pain in his right leg at thirty degrees and in his left leg at fifteen degrees, and experienced pain on palpation of the lumbar spine.  R. 361.  Searles walked with a left leg limp, could walk on his heels, and could tandem walk, but he could not walk on his toes, or stoop.  R. 361.  Dr. Greenberg diagnosed severe osteoarthritis of the lumbar spine and hips from previous injuries that was aggravated by morbid obesity.  R. 361.  Based on his findings, Dr. Greenberg concluded Searles would be unable to perform any work-related activities that required prolonged standing, walking, sitting, bending, or lifting.  R. 361.

X-rays of Searles' hip taken on March 21, 2013 revealed an abnormal structure at the lateral aspect of the hip joint that could represent a loose body.  R. 363.

On March 27, 2013, after reviewing Searles' medical record, state agency physician Candace Mihm, Ph.D., assessed plaintiff's mental residual functional capacity ("RFC") finding Searles had a mild to moderate impairment based on depression and IQ scores. R. 70-74.  Dr. Mihm concluded Searles' mental impairments caused a moderate restriction of Searles' activities of daily life, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  R. 73.  Dr. Mihm found that Searles' depressive symptoms and chronic pain may interfere with his ability to effectively manage stress, but concluded Searles could understand and remember simple instructions and procedures requiring brief initial learning periods, like simple one and two-step tasks; could sustain concentration, effort and pace for simple tasks requiring little independent judgment and involving minimal variations; could relate adequately to coworkers and supervisors; and, could adapt to simple changes and avoid hazards in a routine work environment.  R. 77-78.

Also, on March 27, 2013, state agency physician Glenn Bigsby, D.O., reviewed Searles' medical records and completed a physical RFC assessment. R. 74-76. Dr. Bigsby found Searles could occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, stand and walk with normal breaks for six hours in an eight-hour day, sit for six hours in an eight-hour workday, push or pull without limitation, and only occasionally climb ladders, ropes or scaffolds. R. 75.

On June 3, 2013, when Searles was treated at the Helping Hands Clinic due to back and hip pain, the progress notes indicate mild reactive depression and obesity. R. 365-66. Searles was prescribed meloxicam and Naproxen. R. 366.

Searles was admitted to the emergency room on August 20, 2013 reporting chronic hip and back pain that was aggravated by activity, bearing weight, and palpation. R. 367-95. On examination, Searles had a normal range of motion in both his hip and lumbar back, but exhibited decreased strength and tenderness in his hip, and tenderness, pain and spasm in his back. R. 371. Searles was discharged with ibuprofen. R. 371.

On September 9, 2013, Searles returned to Helping Hands Clinic requesting assistance with his disability forms. R. 467. Harvey Rohlwing, M.D., examined Searles and noted Searles was ambulating slowly with an analgesic gait. R. 467. His back was tender with a decreased range of motion. R. 467. Dr. Rohlwing recommended Searles continue taking his current medications, including Tylenol PM. R. 467. He further recommended that Searles stretch, perform range of motion exercises, and walk as much as possible multiple times each day. R. 467.

Dr. Rohlwing completed a "Medical Opinion Re: Ability To Do Work-Related Activities" form diagnosing Searles with chronic severe pain in back and hips and finding Searles was not capable of full-time work.  R. 396.  Dr. Rohlwing indicated Searles could stand and walk for twenty minutes, sit for thirty minutes, and occasionally lift and carry less than ten pounds.  R. 396.  Searles would need to lie down every few hours and shift at will between sitting and standing.  R. 396.  Lastly, Dr. Rohlwing indicated Searles' impairments would cause him to be absent from work more than three times per month.  R. 396.

Searles presented to the emergency room in September 2013, January 2014, and February 2014 reporting lower back pain.  R. 428-29, 441-42, 453-54.  Examinations of Searles' back, as well as his upper and lower extremities, were normal on each occasion, though he did exhibit tenderness in his lower back.  *Id.*  Searles was oriented with normal judgment and affect.  *Id.*  He was prescribed Flexeril, ibuprofen, and tramadol.  *Id.*

X-rays taken of Searles' lumbar spine in February 2014 were negative, revealing normal curvature and alignment without fracture, compression, disc space narrowing, or osteophyte formation.  R. 453, 457.

On March 19, 2014, Searles was examined by Angelica Perry, D.O., with Riverside Eastern Shore Physicians and Surgeons.  R. 463-64.  Searles reported back and hip pain that was better when lying down and worse when walking, muscle spasm, pain in his left leg, and weakness in the left leg.  R. 463.  Searles walked slowly with an antalgic gait, and was tender everywhere on his lower back, could lift his right leg to 90 degrees of flexion at the hip, and his left leg to 40 degrees.  R. 464.  When Dr. Perry attempted resisted hip flexion, Searles said he could not do it; however, Dr. Perry noted there was no engagement of the quadriceps muscle

whatsoever.  R. 464.  Dr. Perry was suspicious of malingering, but this was difficult to determine as it was Searles' initial visit.  R. 464.  Dr. Perry noted Searles had a flat affect and seemed depressed.  R. 464.  Dr. Perry prescribed two Aleve as needed for pain, and use of a cane as needed.  R. 464.  At Searles' request, Dr. Perry ordered an MRI, but she instructed Searles to discuss the cost with the hospital prior to proceeding.  R. 464.

**D.  *Searles' Statements, Disability Reports, and Hearing Testimony***

Searles completed a questionnaire in December 2012, indicating that he had daily pain that was relieved by lying down, and although he needed medication, did not currently have any. R. 214.  Searles reported he could drive, take care of his kids, cook, and take a bath, but his back hurt when he cleaned the house and did laundry.  R. 214-15.  Searles reported he could not work or do yard work because of back pain.  R. 215.

On March 8, 2013, Searles completed a "Disability Report" indicating he was employed one day per week at Winn Dixie, but had difficulty performing the job due to pain.  R. 224.

At the time of the hearing held April 9, 2014, Searles was thirty-three years old, weighed 267 pounds, and was living in a house with his sister and her children. R. 30-31.  Searles' driver's license was suspended due to his failure to pay fines, and he relied on his mother and sister for transportation.  R. 31.

With respect to his education, Searles testified that he began attending a special education learning center when he was in the eighth grade, but that he left school without receiving a high school diploma, never acquiring a GED or high school equivalent.  R. 33.

When asked to describe his typical day, Searles responded that he would lie down for five to six hours.  R. 31-32.  Searles testified that he did not do chores, did not go out, did nothing for

fun, could no longer perform full-time work due to chronic pain, and could not afford to pay for his medications.  R. 32, 34, 37.  Searles estimated that he could lift ten pounds, walk for fifteen minutes, sit for thirty minutes, and stand for twenty minutes.  R. 32-33, 36.

The ALJ asked VE Tanya Schola a hypothetical question asking whether jobs were available for an individual with Searles' age, education, and work experience who was capable of a limited range of sedentary work, who was capable of occasional ramps and stairs; no ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; no exposure to unprotected heights and hazards; unskilled one or two-step work; occasional changes to the work setting; and occasional work-related decisions.  R. 39.  Based on that hypothetical, Ms. Schola testified the individual could work as a sorter, cuff folder, and assembler, of which there were significant numbers in the economy.  R. 39-40.  In response to the ALJ's second hypothetical, Ms. Schola testified no jobs existed for a person with these same limitations, who also needed to lay down for four or more hours a day due to chronic pain.  R. 40.  Ms. Schola further testified in response to a third hypothetical from Searles' counsel that no jobs existed for a person with the limitations discussed in the first hypothetical, who would be off task twenty percent or more of the day.  R. 41.

### III.    THE ALJ'S DECISION – APRIL 29, 2014

To evaluate Searles' claim of disability[3], the ALJ followed the five-step analysis set forth in the SSA's regulations for determining whether an individual is disabled.  *See* 20

---

[3] To qualify for SSI and/or DIB, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application, and be under a "disability" as defined in the Social Security Act.  The Social Security Regulations define "disability" for the purpose of obtaining disability benefits under the Act as the inability to do any substantial gainful activity, by reason of any medically determinable physical or mental impairment, which can be expected

C.F.R. §§ 404.1520(a) and 416.920(a).   Specifically, the ALJ considered whether Searles: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents him from performing any past relevant work; and (5) had an impairment that prevents him from engaging in any substantial gainful employment.  R. 12-22.

The ALJ found Searles met the insured status requirements[4] of the Social Security Act through March 31, 2015.  R. 12.  At step one of the sequential evaluation process, the ALJ noted that the work Searles performed after June 1, 2011, the onset date of Searles' alleged disability, did not rise to the level of substantial gainful activity.  R. 12.

At step two, the ALJ noted that Searles had the following severe impairments: degenerative joint disease of the bilateral hips, morbid obesity, depression, and a mildly deficient IQ.  R. 13.  The ALJ found Searles' degenerative disc disease of the spine and history of substance abuse were nonsevere impairments because they did not cause more than minimal limitations in Searles' ability to perform basic work activities and did not cause any significant vocational limitations.  R. 13.

At step three, the ALJ found that Searles' impairments did not alone, or in combination, meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1,

---

to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 20 C.F.R. § 404.1505(a) (2012); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A) (2012). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy.  20 C.F.R. § 404.1505(a) (2012).

[4] To qualify for DIB, an individual must also establish disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act.  *See*  42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

specifically section 1.00 for musculoskeletal system and section 12.00 for mental disorders, giving consideration to the combined effect of obesity.  R. 14-17.

The ALJ found that Searles had the RFC to perform a limited range of sedentary work. R. 17.  Searles could only occasionally climb ramps, climb stairs, balance, stoop, kneel, crouch, and crawl.  R. 17.  Searles could not climb ladders, ropes or scaffolds, and must avoid exposure to unprotected heights and hazards.  R. 17.  Searles was limited to performing simple, routine, and unskilled work, defined as a specific vocational profile of two or less, which is one to two step work.  R. 17.  Lastly, Searles could only have occasional changes to the work setting and only occasionally make work related decisions.  R. 17.

Following a review of Searles' work history reports and earnings record, the ALJ found Searles had no past relevant work.  R. 21.  Accordingly, there was no need to address step four, determining whether Searles has an impairment that prevents him from past relevant work.  R. 21.

At step five, the ALJ found that Searles was not disabled from the alleged onset of disability date through the date of the decision because there were jobs that existed in significant numbers in the national economy that Searles could perform, such as sorter, cuff folder, and assembler.  R. 22.

### III.  STANDARD OF REVIEW

In reviewing a decision denying benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g) (2012); *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Johnson v. Barnhart*, 434 F.3d 650, 653

(4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

When reviewing for substantial evidence, the Court does not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Commissioner." *Hancock*, 667 F.3d at 472 (citations omitted). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Hancock*, 667 F.3d at 476. Thus, reversing the denial of benefits is appropriate only if either (A) the ALJ's determination is not supported by substantial evidence on the record, or (B) the ALJ made an error of law. *Coffman v. Brown*, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. <u>ANALYSIS</u>

### A. *The ALJ Improperly Weighed the Medical Opinions*

When assigning weight to the opinions of the three examining physicians, the ALJ erred by relying on medical evidence from 2006 to determine Searles was not disabled following his alleged onset date in 2011. R. 17-21. The ALJ improperly assigned significant weight to the 2006 opinion of Dr. Holden with Sports Medicine and Orthopaedic Center, Inc., while relying on this 2006 opinion as well as several 2006 test results to discount the 2013 opinion of Dr.

Rohlwing with Helping Hands Clinic, and the 2013 opinion of Dr. Greenberg who performed a consultative examination of Searles.  R. 20-21.[5]

### 1.    Making an RFC Determination

The regulations provide that after step three of the ALJ's five-part analysis, but prior to deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's RFC.  20 C.F.R. § 404.1545(a).  The RFC is a claimant's maximum ability to work despite his limitations.  20 C.F.R. § 404.1545(a)(1).  The determination of RFC is based on a consideration of all the relevant medical and other evidence in the record.   20 C.F.R. § 404.1545(a)(3).[6]

When making the RFC determination, the ALJ must consider the objective medical evidence in the record, including the medical opinions.  The ALJ is required to explain in his decision the weight assigned to all opinions, including treating sources, non-treating sources, State agency consultants, and other nonexamining sources. 20 C.F.R. § 404.1527(e)(2)(ii) and § 416.927(e)(2)(ii).   Under the federal regulations and Fourth Circuit case-law, a treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."   20 C.F.R. § 404.1527(c)(2) and § 416.927(c)(2), *see also*

---

[5] The Court does not find the ALJ erred in weighing the medical opinions of Dr. Shea, Dr. Bigsby and Dr. Mihm.  R. 20.  The ALJ assigned partial weight to the July 10, 2006 psychology report completed by consultative examiner Dr. Shea, indicating in his discussion of Dr. Shea's opinion that it was "considered for historical purposes mostly."  *Id.*  The ALJ also considered relevant evidence when he assigned moderate weight to the March 27, 2013 assessments by state agency physicians Dr. Mihm and Dr. Bigsby.  *Id.*

[6] "Other evidence" includes statements or reports from the claimant, the claimant's treating, or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptom affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

*Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Conversely, "if [a] physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."  *Craig*, 76 F.3d at 590.  However, even if a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors" provided by the regulations.  SSR 96-2p, 61 Fed. Reg. 34490, 34491, 1996 WL 374188, at *4 (July 2, 1996).

Those factors are: (1) examining relationship, giving more weight to sources who have examined a plaintiff; (2) treatment relationship, looking at the length, nature, and extent of the treatment relationship; (3) supportability, based on the amount of evidence presented in support of the opinion; (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. § 404.1527(c) and § 416.927(c).

### 2.      Consideration of Pre-Onset Medical Evidence

Medical opinions contained in the record that predate a plaintiff's alleged onset date arguably can be considered by the ALJ when determining a plaintiff's RFC.  *See* 20 C.F.R. §404.1527(b) ("In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."); *see also* 20 C.F.R. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive.").  Similarly, pre-onset medical evidence can provide historical context for a plaintiff's impairments.  *See Brooks v. Colvin*, 1:11CV2124-SKO, 2014 WL 1270531, at *13-14 (E.D. Cal. Mar. 26, 2014) (holding that medical evidence associated with a prior claim for benefits was relevant "to the extent it sheds light on plaintiff's longitudinal condition, treatment, and the severity of his condition over time").  However, while they can be considered, medical

16

opinions that predate the alleged onset date are of limited relevance. *Bonds v. Astrue*, No. 2:11CV578, 2012 WL 4026561, at *5 (E.D. Va. Aug. 22, 2012) (citing *Carmickle v. Comm'r of Soc. Sec.,* 533 F.3d 1155, 1165 (9th Cir. 2008) ("Medical opinions that predate the alleged onset of disability are of limited relevance.") *report and recommendation adopted*, No. 2:11CV578, 2012 WL 4017933 (E.D. Va. Sept. 12, 2012)).[7]  To properly consider pre-onset evidence, an ALJ must acknowledge that the evidence predates the alleged onset date and explain the relevance to a plaintiff's disability claim.[8]  Moreover, an ALJ errs in assigning pre-onset evidence substantial weight when determining a plaintiff's RFC.[9]

---

[7] *See also Ybarra v. Colvin*, EDCV 13-1596-DTB, 2014 WL 4793032, at*2 (C.D. Cal. Sept. 25, 2014) (finding opinion that predated alleged onset date by one year and six months was of limited relevance); *Beasterfeld v. Astrue*, 8:10cv979-T-30EAJ, 2011 WL 2632075, at *7 (M.D. Fla. June 2, 2011) (finding opinion that predated the alleged onset date by more than four years was of limited relevance); *Douglas v. Astrue*, No. 03:11-CV-00770-HU, 2012 WL 4485679, at *21 (D. Or. Aug. 28, 2012) *report and recommendation adopted,* No. 3:11-CV-00770-HU, 2012 WL 4485670, at *21 (D. Or. Sept. 27, 2012) (finding the ALJ's consideration of medical evidence from 2003 and 2005 to determine plaintiff's condition in March 2006 was erroneous).

[8] *See Fong v. Colvin*, No. CV 14-6351 JC, 2015 WL 4624168, at *7 (C.D. Cal. July 31, 2015) (holding that ALJ's reliance on evidence dated five to fourteen months prior to the alleged onset date was erroneous where ALJ did not explain the relevance of pre-onset evidence); *Keister v. Astrue*, No. 11-cv-05216-RBL-JRC, 2012 WL 933109, at *3 (W.D. Wash. Feb. 13, 2012) (holding that before an ALJ can properly rely on pre-onset evidence, the ALJ must indicate an awareness that the records precede the onset date).

[9] *See Calhoun v. Astrue*, No. CA 09-0417-CG-C, 2010 WL 1267436, at *4 (S.D. Ala. Mar. 12, 2010) (holding an RFC assessment predating the amended disability date could not supply substantial evidence of RFC during the relevant period because it was of limited relevance and was contrary to an RFC from the relevant period by a treating physician); *Padgett v. Colvin*, No. 3:14cv504, 2014 WL 4269503, at *15 (M.D. Pa. Aug. 29, 2014) (holding the ALJ's assignment of "significant weight" to the opinion of a state agency medical consultant's opinion that predated the alleged onset date by eight days and was based on evidence prior to the onset date was problematic and could not be considered harmless error); *Cunningham v. Colvin*, No. ED CV 13-1094-E, 2014 WL 296846, at *2 (C.D. Cal. Jan. 28, 2014) (holding it was improper for the ALJ to assign "great weight" to an opinion that predated plaintiff's alleged disability onset).

### 3.      Errors by the ALJ

The ALJ erred in assigning weight to the medical opinions based on pre-onset evidence without acknowledging that the evidence was pre-onset or explaining its relevance.  The ALJ assigned "significant" weight to Dr. Holden's April 10, 2006 report "regarding the plaintiff's lumbar problem" because it is "consistent with the evidence of record as a whole."  R. 19.  Dr. Holden indicated that Searles' examination was basically normal, and that Searles' statement that he was unable to work at a job washing dishes was incompatible with the physical examination. R. 307.  In assigning significant weight to Dr. Holden's report, the ALJ discussed how the report was consistent with the evidence in the record as a whole, and referenced: (1) Dr. Holden's normal findings during the April 10, 2006 examination; (2) the unremarkable results from two April 11, 2006 x-rays of Searles' lumber spine; (3) a negative May 6, 2006 MRI of Searle's lumbar spine; and (4) negative February 21, 2014 x-rays of Searles' lumbar spine.  R. 19-20. Not only was Dr. Holden's report over five years old at the time of Searles' alleged onset of disability, but most of the evidence relied upon by the ALJ for assigning the opinion significant weight is similarly outdated.

Under the circumstances presented in this case, where Searles asserts chronic pain resulting from motor vehicle accidents in 2001 and 2005, with no other intervening cause, medical evidence dating back to 2006 can be relevant to the ALJ's decision in that it provides a longitudinal view of Searles' impairments.  *See Brooks*, 2014 WL 1270531, at *13-14.  The ALJ does not acknowledge, however, that Dr. Holden's opinion was given over five years prior to Searles' alleged onset date, and does not explain why an opinion so remote from the relevant period would be entitled to any weight, much less significant weight.  Therefore, the Court finds

the ALJ erred in assigning significant weight to Dr. Holden's April 2006 opinion when determining Searles' claim of disability beginning in June 2011.

This error was compounded when the ALJ relied on Dr. Holden's 2006 opinion to discount the opinions of Dr. Greenberg (examining physician) and Dr. Rohlwing (treating physician), the only medical opinions from physicians who examined Searles during the relevant period. Dr. Greenberg determined that, due to Searles' severe osteoarthritis of the lumbar spine and hips, Searles would be unable to perform any work-related activities that required prolonged standing, walking, bending, or lifting. R. 361. Similarly, plaintiff's treating physician, Dr. Rohlwing, found that, due to chronic severe pain in his back and hips, Searles could only stand and walk for twenty minutes, sit for thirty minutes, would need to shift at will between sitting and standing, and would need to lie down every few hours. R. 396.

The ALJ assigned Dr. Greenberg's opinion moderate weight, agreeing with the report as it related to Searles' hip problems, but finding the back complaints were exaggerated based on Dr. Holden's 2006 report. R. 20. The ALJ's use of pre-onset evidence to discount Dr. Greenberg's opinion is even more problematic because Dr. Greenberg's diagnosis, severe osteoarthritis due to Searles' earlier injuries, is an impairment that can be progressive and may have developed after 2006. The ALJ proceeded to assign "slight weight" to Dr. Rohlwing's opinion, finding it was not supported by the objective findings in the record, specifically citing Dr. Holden's April 2006 examination, the two April 2006 x-rays, the May 2006 MRI, and the

February 2014 x-rays.   R. 21.   Although there may be valid reasons for not assigning Dr. Rolhwing's opinion controlling weight,[10] the ALJ did not discuss these factors.

Despite the consistent findings of Dr. Greenberg and Dr. Rohlwing, the only physicians to examine Searles during the relevant period and offer opinions regarding his impairments, the ALJ determined these opinions should be discounted because they were not consistent with medical evidence from several years prior to Searles' alleged onset.   The ALJ made this determination without acknowledging the remoteness of the 2006 opinion and medical records with respect to Searles' alleged onset date in 2011.   Due to these errors, the Court cannot determine if the ALJ would have come to the same conclusion if he had solely relied on relevant evidence from the alleged onset date of June 1, 2011 through the date of the opinion.   *See Farr v. Colvin*, 2014 WL 47379, at *10 (M.D. Pa. Jan. 6, 2014) (holding that due to the ALJ placing "great weight" on improper evidence, the Court could not determine if the ALJ would have come to the same conclusion if he had not placed any weight on the improper evidence); *Lantelme v. Astrue*, 2012 WL 4056862, at *5 (E.D. Cal. Sept. 14, 2012) (holding the ALJ's reliance on improper evidence was not harmless where the ALJ assigned "substantial weight" to the evidence).   Under the circumstances of this case, where the medical opinions from the two physicians who examined Searles during the relevant period are consistent and indicate Searles has extreme limitations, where the ALJ improperly relied on evidence that predated Searles'

---

[10] Dr. Rohlwing completed the medical opinion form during Searles' second visit to the Helping Hands Clinic.   Although he had the benefit of reviewing the progress note from June 3, 2013, and examined Searles on July 9, 2013, the only medical finding listed on the opinion form is "very limited movement of spine."   R. 396.   In addition, the only medical treatment Dr. Rohlwing referenced is Searles' left hip replacement in 2001 and over the counter medication. R. 396.   The remaining entries on the form appear to be based on Searles' recitation of his symptoms, "lays down every few hours," "pain interferes with shopping, cleaning, etc.," and "attempted to work 9 months ago – only able to last one month."   R. 396.

alleged onset date by over five years to reach his decision, and where the consultative examiner diagnosed an impairment that is progressive and may have developed in the years after the medical evidence relied upon by the ALJ, the Court cannot find substantial evidence to support the ALJ's decision.  Accordingly, the case should be remanded.

**B.**     ***The Court Will Not Consider the Medical Record Submitted with Searles' Motion for Summary Judgment***

Searles has also attached to his motion a medical record dated October 22, 2014.  ECF No. 16-1.  This document has not been considered by the Court as it was not part of the record on appeal, and "[r]eviewing courts are restricted to the administrative record in performing their limited function of determining whether the Secretary's decision is supported by substantial evidence."  *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (citing *Huckabee v. Richardson,* 468 F.2d 1380, 1381 (4th Cir. 1972)).

## V.  <u>RECOMMENDATION</u>

For the reasons set forth above, this Court recommends that Searles' Motion for Summary Judgment (ECF No. 16) be GRANTED, Defendant's Motion for Summary Judgment (ECF No. 17) be DENIED, and the decision of the Commissioner be VACATED and REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation.

## VI.  <u>REVIEW PROCEDURE</u>

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. §  636(b)(1)(c):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing

of this report to the objecting party, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules.  A party may respond to another party's objection within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a de novo determination of those portions of this Report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir.).

_____/s/_____<br>
Robert J. Krask<br>
United States Magistrate Judge

Norfolk, Virginia<br>
November 25, 2015